**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STEVEN JEFFREY HOWITT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>QUEST DIAGNOSTICS INCORPORATED,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY DEMAND |

Plaintiff Steven Jeffrey Howitt ("Plaintiff") brings this class action against Quest Diagnostics Incorporated ("Quest" or "Defendant") for its alleged failure to reasonably secure and safeguard the personally identifiable information and protected health information it collected and maintained concerning Plaintiff and Class Members.

## INTRODUCTION

1. Quest is a Delaware corporation with its principal place of business in Secaucus, New Jersey, that provides diagnostic testing and information services to patients, physicians, and hospitals nationwide.

2. In the course of its business, Quest collected and maintained personally identifiable information concerning its patients ("PII") or that of the patients of its healthcare clients, as well as protected health information ("PHI").

3. On October 22, 2026, Quest disclosed in a Form 8-K filed with the United States Securities and Exchange Commission ("SEC") that it had learned on October 21, 2026, of unauthorized access to its Quanum Lab Services Manager ("Quanum") system (the "Data Breach"). Quanum is a system that certain healthcare clients use to place test orders and receive and look up results.

4. Quest stated that it believed an unauthorized party accessed certain patient records and that the scope of the unauthorized access remained under investigation.[1]

5. Plaintiff and Class Members are patients and customers of Defendant and/or Defendant's healthcare provider clients who entrusted their sensitive, non-public PII and PHI to Quest in order to obtain medical analyses, testing and diagnoses. To conduct its operations and provide diagnostic testing and related services, Defendant collects Plaintiff's and Class Members' PII and PHI, which it retains for extended periods.

6. Having collected and retained Plaintiff's and Class Members' PII and PHI, Quest assumed responsibility for using it only for legitimate purposes, limiting access to authorized persons, retaining it only as long as reasonably necessary or legally required, and employing safeguards appropriate to the sensitivity of the information and the foreseeable consequences of its compromise.

7. Plaintiff alleges that Quest failed to employ data-security measures reasonably appropriate for a healthcare entity maintaining sensitive and persistent identity information, failed to prevent or adequately limit the unauthorized acquisition of that information, failed to reasonably protect sensitive information against access in readable form.

8. As a result, Plaintiff and Class Members have suffered a loss of privacy and control over their PII and PHI, time and expenses reasonably incurred investigating and mitigating the risks created by the Data Breach, diminished value of the services for which they paid, and exposure to a continuing risk of identity theft, fraud, phishing, account takeover, and other misuse.

9. Plaintiff and Class Members have a continuing interest in ensuring that the PII and PHI that Quest continues to maintain is reasonably protected against future unauthorized access

[1] Quest Diagnostics Incorporated, *Form 8-K*, Item 8.01 (filed Oct. 22, 2026), https://www.sec.gov/Archives/edgar/data/1022079/000094787126000941/ss6979200_8k.htm.

and disclosure. Plaintiff therefore brings this action to recover the relief available for Quest's alleged conduct and to obtain appropriate declaratory and injunctive relief.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), (5)(B), and (6). Plaintiff is a New York citizen, Quest is a citizen of Delaware and New Jersey, and the proposed action satisfies minimal diversity.

11. On information and belief, the Nationwide Class includes at least 100 persons, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This allegation is based on Quest's nationwide laboratory services, Quanum LSM's clinical ordering and results-access functions, Quest's disclosure that unauthorized access involved patient information, and the aggregate compensatory and otherwise recoverable relief sought for affected persons. The affected-person count and records necessary to quantify their claims are principally within Quest's possession. Quest maintains the affected-system, patient-identification, and investigation records necessary to determine the precise class size and scope. Jurisdiction rests on the Class Action Fairness Act, not a private federal cause of action under HIPAA.

12. This Court has personal jurisdiction over Quest because Quest maintains its principal place of business in New Jersey and is at home in this State. Venue is proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because Quest resides in this District for venue purposes.

## THE PARTIES

### Plaintiff

13. Plaintiff is an adult individual and, at all relevant times herein, a resident of New York, New York, and a citizen of the State of New York. Plaintiff was a customer of Quest for certain diagnostic testing on several occasions in 2026.

14. In having these tests taken, Plaintiff provided Quest with sensitive personal information, including his name, contact information, date of birth, Social Security number, and financial and payment information, and Quest generated and maintained his test results. Quest thereafter maintained and controlled Plaintiff's PII and PHI as reflected on these tests.

15. Upon information and belief, Plaintiff's PII and PHI was maintained in the systems or files accessed and acquired by the unauthorized third party during the Data Breach. Plaintiff did not authorize the unauthorized third party to access or acquire his PII and did not consent to its disclosure to any unauthorized person.

16. Plaintiff is a member of the proposed Nationwide Class and New York Subclass.

17. After learning of the Data Breach, Plaintiff spent time investigating its legitimacy and potential impact, reviewing credit-monitoring and identity-theft protection options, monitoring his financial and credit accounts with heightened scrutiny. This was time Plaintiff otherwise would not have spent but for the Data Breach.

18. The Data Breach has also exposed Plaintiff to a substantial and imminent risk of identity theft and fraud. The information involved, including Plaintiff's Social Security number, date of birth, and financial information and PHI, is sensitive, cannot be readily changed, and can be used alone or together with other information to commit identity theft and financial and medical fraud.

19. Plaintiff has suffered a loss of privacy and control over his PII and PHI, which he provided to Quest for the limited purpose of obtaining healthcare and related services and which was accessed or acquired by an unauthorized third party without his knowledge or consent. The alleged unauthorized access also deprived Plaintiff of the confidentiality of medical information entrusted to Quest for diagnostic services.

20. Plaintiff has also experienced anxiety and concern regarding the possibility that cybercriminals may access, use, sell, or otherwise misuse his PII and/or PHI.

21. Plaintiff's injuries are ongoing because the compromised PII and/or PHI includes persistent identifiers that cannot readily be replaced, and Plaintiff must continue monitoring his accounts and credit for indications of fraud or identity theft.

22. Plaintiff has a continuing interest in ensuring that the PII and PHI that Quest continues to maintain about him is reasonably protected from future unauthorized access and disclosure.

**Defendant Quest**

23. Defendant Quest is a Delaware corporation with a principal place of business in Secaucus, New Jersey.

## FACTUAL ALLEGATIONS

### A. Quest Collected and Retained Plaintiff's and Class Members' PII and PHI

24. Defendant is a provider of diagnostic testing and information services to patients, physicians, and hospitals nationwide.

25. Plaintiff and Class Members are patients whose PII and PHI was maintained by Quest.

26. As a condition of receiving Quest's diagnostic services, Plaintiff and Class Members were required to entrust Defendant, directly or through their healthcare providers, with their highly sensitive PII and PHI, including but not limited to their names, mailing addresses, phone numbers, email addresses, dates of birth, Social Security numbers, genders, information related to their medical providers and services, diagnosis codes and insurance policy numbers.

27. Quest's HIPAA Notice of Privacy Practices states that Quest and its affiliated

covered entities are committed to protecting identifiable health information, must maintain the privacy of PHI, and must notify affected individuals of breaches involving unsecured PHI. The Notice also describes authorized uses and disclosures.[2]

28. Upon information and belief, the information that Defendant held in its computer systems at the time included unencrypted PII and PHI of Plaintiff and Class Members.

29. Quest retained records concerning Plaintiff and Class Members in connection with its diagnostic services. Quest also publicly describes cybersecurity and privacy programs addressing access controls, vulnerability management, incident response, and administrative, technical, and physical safeguards.[3]

30. Upon information and belief, Quest retained Plaintiff's and Class Members' PII and PHI in the systems, files, or data repositories accessed or acquired by the unauthorized third party during the Data Breach.

31. Plaintiff and Class Members reasonably expected Quest to maintain the confidentiality of their PII and PHI, use that information only for legitimate diagnostic and administrative purposes, and disclose it only as authorized or required by law.

32. Plaintiff and Class Members took reasonable measures to preserve the confidentiality of their PII and PHI. Once they provided that information to Quest, however, they had no ability to control the security of Quest's systems or the manner in which Quest stored, protected, and retained their information.

**B. The Data Breach**

---

[2] Quest Diagnostics, *HIPAA Notice of Privacy Practices*, https://www.questdiagnostics.com/our-company/privacy/notice-of-privacy-practices (last visited Oct. 27, 2026).
[3] Quest Diagnostics, *Cybersecurity & Privacy*, https://www.questdiagnostics.com/our-company/corporate-responsibility/cybersecurity---privacy (last visited Oct. 27, 2026).

33. In its October 22, 2026 SEC filing, Quest disclosed unauthorized access to the Quanum system that it learned of on October 21, 2026.

34. Quest stated that the unauthorized access involved, in its assessment at that time, "certain patient records."

35. Quest stated that it had notified federal law enforcement and retained outside cybersecurity experts to investigate and respond.

36. The precise date and method of the initial intrusion, the duration of the unauthorized access, and the systems and security controls affected are presently known only to Quest and its forensic investigators.

37. Upon information and belief, the unauthorized third party accessed and acquired files containing the PII and/or PHI of Plaintiff and Class Members.

38. The method of intrusion, the identity and motive of the unauthorized party, and whether data was exfiltrated remain under investigation.

39. Plaintiff and Class Members did not authorize Quest to disclose their PII or PHI to any unauthorized person.

**C. Quest Knew or Should Have Known of the Risk of Cyberattacks**

40. Long before the Data Breach, Quest knew or should have known that healthcare providers including testing facilities were frequent targets of ransomware and data-extortion attacks. Quest itself disclosed a prior intrusion in December 2016, when an unauthorized party obtained PHI, including laboratory results, concerning approximately 34,000 individuals through the separate MyQuest by Care360 application. This earlier event provided notice of the risk of unauthorized access to confidential patient information.[4]

[4] Quest Diagnostics, *Quest Diagnostics Provides Notice of Data Security Incident* (Dec. 12, 2016),

41. The *HIPAA Journal* ("Journal") has compiled statistics on healthcare data breaches since 2009. Those statistics document numerous breaches affecting 500 or more individuals and identify hacking as a leading cause.[5]

42. The Journal identifies the 2024 Change Healthcare ransomware attack as a major example of the scale of healthcare data breaches. *Id*.

43. Quest therefore knew or should have known both that cyberattacks were occurring with increasing frequency and that an institution maintaining large quantities of PII and PHI needed safeguards capable of preventing, detecting, containing, and responding to unauthorized access.

44. Quest also knew or should have known that patient information remained valuable to cybercriminals long after the patient's tests were taken because persistent identifiers such as Social Security numbers and dates of birth do not expire and cannot readily be changed.

**D. Quest Failed to Employ Reasonable Data-Security Measures**

45. By collecting, maintaining, and using Plaintiff's and Class Members' PII and PHI, Quest assumed legal and equitable duties to protect that information against unauthorized access, acquisition, use, and disclosure. For electronic PHI maintained in its covered healthcare operations, HIPAA's Security Rule requires protection against reasonably anticipated threats and impermissible uses or disclosures, risk analysis and risk management, review of system activity, incident-response procedures, access controls, audit controls, and authentication. See 45 C.F.R. §§ 164.306(a), 164.308(a)(1)(ii)(A)–(B), (D), (a)(6), and 164.312(a)(1), (b), (d). These requirements inform the applicable standard of care; Plaintiff does not assert a private cause of action under

https://ir.questdiagnostics.com/press-releases/press-release-details/2016/Quest-Diagnostics-Provides-Notice-of-Data-Security-Incident/default.aspx.

[5] The HIPAA Journal, *Healthcare Data Breach Statistics—Updated for 2026*, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited Oct. 26, 2026).

HIPAA.

46. Quest knew or should have known that the PII and PHI it maintained was sensitive, valuable to cybercriminals, and capable of being used to commit identity theft, financial fraud, phishing, account takeover, and other unlawful acts.

47. Quest's duties required it to employ security measures reasonably appropriate to the sensitivity and volume of the information it maintained and the foreseeable risk that cybercriminals would attempt to obtain that information.

48. Quest's duties included designing, maintaining, monitoring, and periodically testing its computer systems, servers, networks, and security controls to identify vulnerabilities and protect against unauthorized access and acquisition.

49. Quest also had a duty to implement reasonable administrative, technical, and physical safeguards, including appropriate access controls, multifactor authentication, encryption where appropriate, network segmentation, logging and monitoring, vulnerability and patch management, employee training, and incident-response procedures.

50. Quest had a duty to employ processes reasonably capable of timely detecting, investigating, containing, and responding to unauthorized activity within its systems and to act reasonably upon security warnings and alerts.

51. Quest had a duty to retain Plaintiff's and Class Members' PII and PHI only for as long as reasonably necessary and to securely delete or otherwise dispose of information for which it no longer had a legitimate medical, business, or legal need.

52. Unauthorized access to patient records can occur through compromised credentials, exploitable vulnerabilities, or other means; the mechanism of this incident is not yet publicly established.

53. Reasonable security measures are designed not only to prevent an initial intrusion but also to restrict privileges, limit movement within a network, detect unusual access or mass collection of information, identify unauthorized outbound transfers, and contain an intrusion before information can be exfiltrated.

54. Upon information and belief, Quest failed to implement and maintain reasonable safeguards sufficient to prevent, timely detect, contain, or materially limit the unauthorized access and acquisition of Plaintiff's and Class Members' PII and PHI.

55. The precise security deficiencies that permitted unauthorized access, the controls that failed, the length of time the unauthorized third party remained in Quest's systems, and the scope of the affected information are matters within Quest's knowledge and will be established through discovery.

**E. Recognized Cybersecurity Guidance Identified Reasonable Safeguards**

56. Long before the Data Breach, government agencies and cybersecurity organizations had published guidance identifying measures organizations should consider when collecting, maintaining, and protecting sensitive personal information.

57. The Federal Trade Commission's publication, *Protecting Personal Information: A Guide for Business*, advises organizations to identify the personal information they maintain, retain such information only for as long as reasonably necessary, limit access to sensitive information, securely store and transmit it, monitor their networks for suspicious activity, oversee service providers, securely dispose of information that is no longer needed, and maintain a plan for responding to security incidents.[6]

[6] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* 2–13 (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

58. The National Institute of Standards and Technology's Cybersecurity Framework identifies six interrelated functions for managing cybersecurity risk: Govern, Identify, Protect, Detect, Respond, and Recover. Those functions include identifying organizational assets and risks, controlling access to information, protecting stored data, continuously monitoring for anomalous activity, managing incident response, and restoring affected systems.[7]

59. The Center for Internet Security's Critical Security Controls similarly identify safeguards concerning asset and software inventories, data protection, secure configuration, account and access management, vulnerability management, audit logging, malware defenses, data recovery, network monitoring, employee training, service-provider management, incident response, and penetration testing.[8]

60. The Cybersecurity and Infrastructure Security Agency has advised organizations to employ measures such as multifactor authentication, timely remediation of known vulnerabilities, appropriate logging, network monitoring, protected backups, incident-response planning, and controls governing privileged and remote access.[9]

61. This guidance does not create a private cause of action under federal law. It is relevant, however, to the security measures that were widely known and reasonably available before the Data Breach and to whether Quest exercised reasonable care in protecting the sensitive information it maintained.

62. Upon information and belief, Quest failed to implement or properly maintain one or more reasonable safeguards identified in this guidance. The particular controls Quest employed,

---

[7] National Institute of Standards and Technology, *The NIST Cybersecurity Framework (CSF) 2.0*, NIST CSWP 29, at 3–5 (Feb. 26, 2024), https://doi.org/10.6028/NIST.CSWP.29.
[8] Center for Internet Security, *CIS Critical Security Controls Version 8*, Controls 1–18, https://www.cisecurity.org/controls/v8 (last visited Aug. 4, 2026).
[9] Cybersecurity and Infrastructure Security Agency, *#StopRansomware Guide*, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Aug. 4, 2026).

the manner in which those controls were configured and monitored, and the controls that failed are matters within Quest's possession and will be established through discovery.

**F. Quest's Inadequate Disclosure and Response to the Data Breach**

63. As of the filing of this Complaint, Plaintiff has not received an individual notice identifying whether his information was affected or the categories of his information involved.

64. Quest also has not publicly disclosed the dates of the unauthorized access, the particular files affected, the categories of information acquired, the number of individuals affected, or the measures being offered to protect those individuals.

65. In an update dated October 26, 2026, Quest stated that it had remediated the incident and restored Quanum and the other paused systems. Quest reported that no data was accessed in Essential Insights or LabHQ, which it had paused as a precaution. It continued investigating the affected patient information and stated that it would notify affected patients and providers.[10]

66. The information publicly available does not identify which particular records belonging to Plaintiff or Class Members were affected or what protective measures are appropriate to each affected person.

67. Without individualized information, Plaintiff and Class Members must assess potential risks using the limited information currently available.

68. Plaintiff's and Class Members' PII and PHI is no longer within Quest's exclusive control. The unauthorized acquisition of that information has exposed Plaintiff and Class Members to the risk that their PII or PHI will be published, sold, combined with information obtained from

---

[10] Quest Diagnostics, *An Update on an Incident Involving One of Our Systems* (Oct. 26, 2026, 8:00 a.m. ET), https://www.questdiagnostics.com/links/quanum-notice (last visited Oct. 27, 2026).

other sources, or used to commit identity theft, financial fraud, phishing, account takeover, or other unlawful acts.

### G. The Value and Continuing Misuse Risk of the Compromised Information

69. PII and PHI is valuable to cybercriminals because they can be used to impersonate victims, access existing accounts, open new accounts, obtain government benefits, file fraudulent tax returns, conduct targeted phishing attacks, and commit other forms of identity theft and fraud.

70. A criminal market exists for stolen personal information, including names, dates of birth, Social Security numbers, financial-account information, payment-card information, login credentials, and combinations of these data elements.

71. The value and usefulness of stolen information increase when several identifying and financial data elements can be linked to the same individual. A collection containing a person's name, Social Security number, date of birth, historical address, and financial information provides a cybercriminal with a more complete identity profile than any one data element standing alone.

72. The United States Government Accountability Office ("GAO") has reported that perpetrators can use stolen account numbers, passwords, and Social Security numbers to take out loans, obtain medical care in another person's name, and make unauthorized purchases.[11]

73. GAO has identified multiple forms of harm resulting from the exposure of sensitive personal information, including new-account fraud, existing-account fraud, fraudulent tax returns, government-benefits fraud, medical identity theft, synthetic identity theft, employment fraud, and the fraudulent creation of telephone and utility accounts.[12]

---

[11] U.S. Gov't Accountability Office, GAO-19-230, *Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services* 5–6 (2019), https://www.gao.gov/assets/gao-19-230.pdf.

[12] *Id.* at 5-6.

74. The Social Security Administration similarly recognizes that a stolen Social Security number can be used to obtain credit, loans, telephone accounts, goods, services, or government benefits and advises individuals whose Social Security numbers have been exposed in a data breach to check, freeze, and monitor their credit.[13]

75. The PII and PHI Quest maintained concerning Plaintiff and Class Members included sensitive information that, unlike a password or payment-card number, cannot readily be changed. A payment card can be cancelled and replaced, but an individual generally cannot replace his or her date of birth, historical addresses, Social Security number or medical information.

76. The risk created by the Data Breach is not limited to immediate misuse. Cybercriminals may retain stolen information, combine it with information obtained from other sources, and use or sell it months or years after its initial acquisition.

77. GAO has specifically found that large amounts of personal information remain outside consumers' control and that bad actors can use stolen information for years after a breach.[14]

78. Once PII has been acquired by an unauthorized third party, the entity that originally maintained the information cannot ensure that every copy has been returned, deleted, or destroyed. Nor can affected individuals determine whether their information has been duplicated, transferred, sold, or combined with information from other sources.

79. The consequences of identity theft include more than unreimbursed financial loss. The Department of Justice's Bureau of Justice Statistics reports that victims may suffer direct losses, indirect and out-of-pocket expenses, lost time spent resolving financial and credit problems,

---

[13] *Fraud Prevention and Reporting*, Social Security Administration, https://www.ssa.gov/fraud/ (last visited Aug. 4, 2026).

[14] U.S. Government Accountability Office, GAO-19-230, *Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services*, Highlights (2019), https://www.gao.gov/assets/gao-19-230.pdf.

and emotional distress.[15]

80. The Bureau of Justice Statistics reported average direct losses of $3,430 among victims of new-account misuse who experienced direct financial loss.[16]

81. The Bureau of Justice Statistics also found that victims of multiple types of identity theft involving an existing account and new-account or other personal-information misuse spent an average of approximately seven hours resolving completed problems; victims in that category whose problems remained unresolved spent substantially longer.[17]

82. Approximately ten percent of identity-theft victims surveyed by the Bureau of Justice Statistics reported severe emotional distress, with higher rates among victims experiencing multiple forms of identity theft.[18]

83. Quest knew or should have known that the unauthorized acquisition of Plaintiff's and Class Members' PII would expose them to a continuing risk of identity theft, financial fraud, phishing, account takeover, and other misuse and would require them to spend time and resources monitoring and protecting their identities and accounts.

**H. Plaintiff and Class Members Have Suffered Continuing Injuries**

84. As a result of the Data Breach, Plaintiff and Class Members lost privacy and control over PII that they entrusted to Quest.

85. Once PII or PHI has been acquired by an unauthorized third party, neither Quest nor the affected individuals can determine with certainty whether the information has been copied, transferred, combined with information obtained from other sources, sold, published, or retained

---

[15] Erika Harrell and Alexandra Thompson, U.S. Dep't of Justice, Bureau of Justice Statistics, *Victims of Identity Theft, 2021*, at 8–12 (Oct. 2023), https://bjs.ojp.gov/document/vit21.pdf.
[16] *Id.* at 9 & tbl. 6.
[17] *Id.*at 10-11 & tbl. 7.
[18] *Id.*at 11-12 & tbl. 8.

for future misuse.

86. Plaintiff and Class Members have reasonably spent, and will continue to spend, time investigating the Data Breach, reviewing financial and credit accounts, evaluating identity-theft protection options, changing account credentials where appropriate, and taking other measures to detect and mitigate potential misuse.

87. The time devoted to those activities represents time Plaintiff and Class Members otherwise would have spent on work, family, or other personal matters.

88. The risks created by the Data Breach are continuing because certain identifiers potentially involved, including Social Security numbers and dates of birth, cannot readily be cancelled or replaced. Misuse may therefore occur months or years after the initial unauthorized acquisition.

89. Plaintiff and Class Members face present and future costs associated with reasonable credit monitoring, identity-theft protection, account monitoring, and other mitigation measures appropriate to the categories of information involved in the Data Breach.

90. Plaintiff and Class Members also received services of diminished value because the diagnostic and related services for which they provided consideration included the reasonable protection of the PII and PHI that Quest required them to furnish.

91. The injuries suffered by Plaintiff and Class Members include, as applicable, loss of privacy and control over their PII and PHI; time and expenses reasonably incurred investigating and mitigating the Data Breach; exposure to a continuing and imminent risk of identity theft, fraud, phishing, and account takeover; diminution in the value of the services received, to the extent proved; anxiety and distress concerning potential misuse; and other economic and noneconomic injuries recognized by law.

92. These injuries were a foreseeable consequence of Quest's alleged failure to employ reasonable data-security, retention, detection, and incident-response practices.

## CLASS ACTION ALLEGATIONS

93. Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

94. Plaintiff seeks to represent the following Nationwide Class:

> All persons in the United States whose PII and/or PHI was accessed or acquired by an unauthorized party in the Data Breach (the "Nationwide Class," whose members are referred to as "Class Members").

95. Plaintiff also seeks certification of the following subclass:

> All members of the Nationwide Class who were residents of New York when their information was affected by the Data Breach (the "New York Subclass").

96. The Nationwide Class and New York Subclass are referred to collectively as the "Classes," and their members as "Class Members." Plaintiff asserts New York law for his individual common-law claims and those of the New York Subclass. For the Nationwide Class, Plaintiff seeks certification of claims or issues susceptible to common treatment under the law selected by the applicable choice-of-law analysis. Alternatively, Plaintiff seeks certification of the New York Subclass.

97. Excluded from the Classes are Quest; its directors and officers; the judicial officer assigned to this case and the members of the judicial officer's staff and immediate family; and any person who timely and validly requests exclusion from any class certified under Rule 23(b)(3).

98. Plaintiff reserves the right to amend or refine the definitions of the Nationwide Class and New York Subclass or to propose appropriate additional subclasses, with suitable representatives, based on information obtained through discovery.

99. The Nationwide Class and New York Subclass are each so numerous that joinder

of their members is impracticable. On information and belief, the nationwide scope and patient-record functions of Quanum support the inference that numerous patients were affected. The precise number and geographic distribution of affected persons are within Quest's knowledge and can be determined from its records and forensic investigation. Plaintiff will establish numerosity separately for the New York Subclass.

100. Commonality. This action presents questions of law and fact common to Plaintiff and Class Members, including:

a. when and how the unauthorized third party gained access to Quest's systems;

b. which systems, files, and data repositories were accessed;

c. whether the unauthorized third party acquired or exfiltrated Plaintiff's and Class Members' PII or PHI;

d. which categories of PII or PHI were involved in the Data Breach;

e. whether Quest owed Plaintiff and Class Members a duty to exercise reasonable care in collecting, maintaining, retaining, securing, and disposing of their PII and/or PHI;

f. whether Quest's data-security practices were reasonable in light of the sensitivity and volume of the information it maintained and the foreseeable risk of a cyberattack;

g. whether Quest failed to comply with its own policies and representations concerning data security and records retention;

h. whether Quest employed reasonable measures to prevent, detect, contain, and respond to unauthorized activity within its systems;

i. whether Quest retained PII and PHI longer than reasonably necessary;

j. when Quest discovered the Data Breach and whether its investigation and response were reasonable;

k. whether Quest provided Plaintiff and Class Members with timely and adequate notice of the Data Breach;

l. whether Quest's acts and omissions caused or contributed to the unauthorized access and acquisition of Plaintiff's and Class Members' PII and PHI;

m. whether Quest has adequately corrected the conditions that permitted the Data Breach;

n. whether Plaintiff and Class Members suffered legally cognizable injuries as a result of Quest's conduct; and

o. whether Plaintiff and Class Members are entitled to damages, restitution, declaratory relief, injunctive relief, or other remedies.

101. Typicality. Plaintiff's claims are typical of the claims of Class Members because his PII and PHI was allegedly affected by the same Data Breach, his claims arise from the same data-security, retention, and notification practices, and his claims are based on the same legal theories as those of the Classes.

102. Adequacy. Plaintiff will fairly and adequately protect the interests of the Classes. His interests are aligned with those of Class Members, he is committed to the prosecution of this action, and he has retained counsel experienced in data-breach and consumer class-action litigation. Plaintiff is not aware of any conflict that would prevent him from adequately representing the Classes.

103. Ascertainability. Membership in the Classes can be determined through objective criteria, including Quest's records, the results of its forensic investigation, the files or systems

accessed by the unauthorized third party, and records identifying the individuals whose information was maintained in those files or systems.

104. Predominance. The common questions arising from Quest's conduct predominate over questions affecting only individual Class Members. Liability will be established principally through evidence common to the Classes, including Quest's information-security policies, data-retention practices, network architecture, access controls, monitoring systems, incident-response procedures, forensic investigation, and communications concerning the Data Breach.

105. Individual questions concerning the precise information belonging to each Class Member or the amount of particular damages do not predominate over the common questions concerning Quest's duties, security practices, retention practices, breach of those duties, and response to the Data Breach. Plaintiff will address material differences in governing state law and, where appropriate, seek certification of claims, subclasses with suitable representatives, or common issues for which common treatment is supported.

106. Superiority. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The damages sustained by individual Class Members may be insufficient to justify the expense and burden of separate litigation, even though the aggregate harm caused by Quest's conduct is substantial.

107. Separate actions would require duplicative discovery concerning the same Data Breach, security practices, and incident response and would create a risk of inconsistent rulings concerning Quest's obligations to persons affected by the same incident. Class treatment will conserve judicial resources and permit Class Members to pursue claims that might otherwise go unredressed.

108. Rule 23(b)(2). Quest has acted or refused to act on grounds generally applicable to

the Classes by maintaining PII or PHI under common data-security and retention practices, failing to provide complete information concerning the Data Breach, and allegedly failing to maintain safeguards adequate to prevent future unauthorized access.

109. Plaintiff and Class Members retain an interest in ensuring that the PII and PHI that Quest continues to maintain is reasonably protected from future unauthorized access and disclosure. Accordingly, final injunctive and corresponding declaratory relief is appropriate with respect to the Classes as a whole under Rule 23(b)(2).

110. In the alternative, particular common issues—including the reasonableness of Quest's security practices, the scope of the Data Breach, Quest's compliance with its records-retention obligations, and the adequacy of Quest's response—are appropriate for classwide adjudication under Rule 23(c)(4).

## CLAIMS FOR RELIEF

### COUNT ONE
**Negligence and Negligence *Per Se***
**(On behalf of the Nationwide Class and the New York Subclass)**

111. Plaintiff realleges and incorporates by reference the preceding allegations as though fully set forth herein.

112. Quest collected, maintained, and controlled Plaintiff's and Class Members' PII and PHI in connection with its medical testing.

113. By collecting and retaining that information, Quest owed Plaintiff and Class Members a duty to exercise reasonable care in storing, securing, and protecting their PII and PHI against unauthorized access, acquisition, disclosure, and misuse.

114. Plaintiff and Class Members were foreseeable victims of Quest's failure to employ

reasonable data-security measures because Quest knew or should have known that:

a. the information it maintained was sensitive and confidential;

b. Social Security numbers, dates of birth, financial information, and PHI can be used to commit identity theft and fraud;

c. healthcare providers are frequent targets of ransomware and other cyberattacks; and

d. unauthorized access to such information could cause substantial and continuing harm to the individuals to whom it pertains.

115. Quest was in the best position to protect the computer systems, networks, databases, and files within its possession and control. Plaintiff and Class Members had no ability to inspect, maintain, or secure those systems.

116. Quest's duty of reasonable care included, among other things, duties to:

a. maintain reasonable administrative, technical, and physical safeguards appropriate to the sensitivity of the information it retained, including encryption where reasonably appropriate;

b. reasonably assess and address vulnerabilities affecting its computer systems and networks;

c. limit access to PII and PHI to authorized persons and purposes;

d. employ reasonable authentication, access-control, encryption, monitoring, backup, and network-segmentation measures, where appropriate;

e. train and supervise personnel with access to PII and PHI;

f. retain PII and PHI only for as long as reasonably necessary or legally required;

g. reasonably monitor its systems for suspicious activity and unauthorized access;

h. investigate suspected security incidents within a reasonable time;

i. take reasonable measures to contain and remediate any security incident; and

j. provide legally required notice of a data breach without unreasonable delay after the applicable statutory conditions were satisfied.

117. These duties arose independently of any contractual obligations Quest may have owed Plaintiff and Class Members.

118. Quest knew or should have known that reasonable cybersecurity safeguards were necessary. Before the Data Breach, government agencies and cybersecurity organizations had repeatedly warned that healthcare entities were being targeted by ransomware groups and other cybercriminals.

119. Upon information and belief, Quest breached its duties by failing to exercise reasonable care in one or more of the following respects:

a. failing to maintain security measures reasonably appropriate to the nature and sensitivity of the PII it retained;

b. failing to identify and remediate vulnerabilities within its computer systems or networks;

c. failing to implement or properly maintain reasonable access controls, authentication measures, network monitoring, encryption, or network segmentation;

d. failing to restrict access to PII and PHI to authorized persons and legitimate purposes;

e. failing to maintain adequate policies governing the retention and secure disposal of PII and PHI;

f. failing to provide adequate cybersecurity training, supervision, or oversight;

g. failing to detect, contain, or remediate the unauthorized access within a reasonable time; and

h. failing to provide affected individuals with timely and adequate notice as required by

applicable law.

120. The precise nature of Quest's security failures is presently within Quest's exclusive knowledge and will be established through discovery.

121. With respect to Plaintiff and the New York Subclass, Quest's handling of electronic PHI in providing the laboratory services at issue is subject to HIPAA's Security Rule. The Rule requires safeguards protecting the confidentiality of that information and guarding against reasonably anticipated impermissible uses or disclosures. 45 C.F.R. § 164.306(a)(1), (3). The technical access-control standard requires policies and procedures allowing access to systems maintaining electronic PHI only by persons or software programs granted access rights. 45 C.F.R. § 164.312(a)(1). Plaintiff and the New York Subclass are within the class these safeguards protect, and unauthorized access to their identifiable medical information is the type of harm the safeguards are intended to prevent.

122. Upon information and belief, Quest violated 45 C.F.R. § 164.312(a)(1) by failing to implement and maintain technical access policies and procedures sufficient to restrict the affected patient records to persons and programs granted access rights. This allegation rests on Quest's operation and control of Quanum, its undertaking to protect confidential patient information, and its disclosure of unauthorized access to patient records. The deficient safeguards permitted or materially contributed to the unauthorized access, loss of medical confidentiality, and resulting injuries alleged herein; their specific operation is reflected in records maintained by Quest.

123. Plaintiff and the New York Subclass invoke these binding safeguards as the applicable standard of conduct for purposes of negligence per se under the governing state common law. This theory does not assert a private federal enforcement action under HIPAA. If

the Court determines that the identified standard does not establish negligence per se, Plaintiff alternatively invokes it as evidence of Quest's breach of the standard of reasonable care alleged in this Count. Plaintiff and Class Members seek recovery for their injuries without duplicate recovery under these alternative negligence theories.

124. Quest's failure to exercise reasonable care permitted or substantially contributed to the unauthorized access to and acquisition of Plaintiff's and Class Members' PII and PHI.

125. The unauthorized access to and acquisition of Plaintiff's and Class Members' PII and PHI, and the resulting injuries, were foreseeable consequences of Quest's failure to employ reasonable data-security measures.

126. To the extent Quest failed to provide timely and adequate notice required by applicable law, that failure prevented or delayed Plaintiff and affected Class Members from taking appropriate measures to protect themselves against identity theft, fraud, and other misuse of their PII and PHI.

127. As a direct and proximate result of Quest's negligence and, where applicable, negligence per se, Plaintiff and Class Members have suffered or face injuries that include:

a. loss of privacy and loss of control over their PII and PHI;

b. time reasonably spent investigating the Data Breach and monitoring their financial and credit accounts;

c. reasonable mitigation expenses and other out-of-pocket losses;

d. exposure to a substantial risk of identity theft, fraud, phishing, and other misuse;

e. diminution in the value of their PII and PHI, to the extent recognized and proved;

f. anxiety and distress concerning the unauthorized acquisition and potential misuse of their PII and PHI; and

g. other economic and noneconomic losses to be established through discovery.

128. Plaintiff's and Class Members' injuries were the direct and proximate result of Quest's acts and omissions and would not have occurred but for Quest's failure to exercise reasonable care and comply with its applicable statutory obligations.

129. Plaintiff and Class Members therefore seek compensatory damages, equitable relief to the extent legally available, pre- and post-judgment interest, attorneys' fees and costs where authorized, and all other appropriate relief.

## COUNT TWO
## Breach of Implied Contract
## (On behalf of the Nationwide Class and the New York Subclass)

130. Plaintiff realleges and incorporates by reference the preceding allegations as though fully set forth herein.

131. When Plaintiff and Class Members obtained services from Quest, they entered into implied contracts with Quest governing their respective relationships.

132. As part of those relationships, Quest required Plaintiff and Class Members to provide sensitive PII and PHI, including information necessary to perform diagnostic testing and to identify the particular patient.

133. Plaintiff and Class Members provided their PII and PHI to Quest for those limited purposes and provided consideration in connection with those services, including any fees they paid and the information necessary for Quest to perform the requested tests.

134. The circumstances surrounding the collection of the PII and PHI demonstrated a mutual understanding that Quest would use the information only for authorized purposes, maintain its confidentiality, and employ reasonable measures to protect it against unauthorized access, acquisition, and disclosure.

135. Quest's promises to provide diagnostic services necessarily included an implied promise that Quest would exercise reasonable care in maintaining and protecting the PII and PHI it required Plaintiff and Class Members to provide.

136. To the extent reflected in the parties' agreement, the implied contracts also required Quest to provide Plaintiff and Class Members with timely and adequate notice if Quest learned that their PII or PHI had been accessed or acquired by an unauthorized person, subject to any lawful investigative or law-enforcement delay.

137. Plaintiff and Class Members accepted Quest's offer by providing the requested PII and PHI and fulfilling their corresponding obligations. A meeting of the minds existed because the parties' conduct demonstrated their mutual understanding that Quest would reasonably protect the PII or PHI entrusted to it.

138. Plaintiff and Class Members performed their obligations under the implied contracts, except for any performance excused by Quest's conduct.

139. Quest breached the implied contracts by failing to employ reasonable measures to safeguard Plaintiff's and Class Members' PII and PHI against unauthorized access and acquisition and, to the extent established through discovery, by failing to provide timely and adequate notice that their PII or PHI had been compromised.

140. As a direct and foreseeable result of Quest's breaches, Plaintiff and Class Members suffered contract damages, including reasonable mitigation expenses and other economic losses caused by the breaches and, to the extent supported by the consideration provided and the terms of the agreements, diminution in the value of services received. The amounts will be established at trial.

## COUNT THREE
**Unjust Enrichment**

**(On behalf of the Nationwide Class and the New York Subclass and Pleaded in the Alternative)**

141. Plaintiff realleges and incorporates by reference the preceding allegations as though fully set forth herein, except to the extent inconsistent with this alternative claim.

142. This claim is pleaded in the alternative to Plaintiff's claim for breach of implied contract pursuant to Federal Rule of Civil Procedure 8(d).

143. Plaintiff and Class Members conferred benefits upon Quest by providing their PII or PHI and, as applicable, paying fees and other amounts associated with their diagnostic testing.

144. Quest knowingly accepted and retained those benefits.

145. When Quest required Plaintiff and Class Members to provide their PII and/or PHI, Plaintiff and Class Members reasonably understood that Quest would use the information only for authorized purposes and would employ reasonable measures to protect it against unauthorized access, acquisition, and disclosure.

146. Reasonable protection of the PII and PHI Quest required Plaintiff and Class Members to provide was an essential component of the services and relationship for which the benefits were conferred.

147. Upon information and belief, a portion of the fees or other amounts received by Quest was used, or should have been used, to fund reasonable information-security measures and protect the PII or PHI that Quest collected and maintained.

148. Quest failed to provide the reasonable data security associated with the benefits it accepted and retained, thereby depriving Plaintiff and Class Members of the full value of the services and protections for which those benefits were conferred.

149. Under the circumstances, it would be inequitable for Quest to retain the portion of those benefits attributable to data security without providing reasonable protection for Plaintiff's

and Class Members' PII and/or PHI.

150. Plaintiff and Class Members therefore seek restitution of the portion of the benefits unjustly retained by Quest, together with such other equitable relief as the Court determines appropriate.

**REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(On behalf of the Nationwide Class and the New York Subclass)**

151. Plaintiff realleges and incorporates by reference the preceding allegations as though fully set forth herein.

152. Quest continues to maintain PII and PHI belonging to Plaintiff and Class Members in its computer systems, networks, databases, backups, archives, or other records.

153. Plaintiff and Class Members have a continuing interest in ensuring that the PII and/or PHI that Quest retains is reasonably secured against further unauthorized access, acquisition, disclosure, and misuse.

154. Although Quest has reported that it remediated the incident and restored the affected system, the details of its present security measures remain within Quest's possession and control.

155. Quest's public statements do not identify the particular measures implemented to protect the PII and PHI it continues to retain or the scope of the information accessed.

156. Without appropriate prospective relief, Plaintiff and Class Members remain subject to a substantial risk that the PII and/or PHI that Quest continues to maintain will be accessed, acquired, or disclosed in another security incident.

157. Monetary relief alone cannot adequately remedy the continuing risk associated with Quest's retention of Plaintiff's and Class Members' sensitive PII and/or PHI or ensure that Quest implements and maintains reasonable measures to prevent further unauthorized access and

disclosure.

158. An actual and present controversy exists concerning whether Quest's current practices adequately protect the PII and/or PHI it continues to retain and whether Quest must implement additional measures to protect Plaintiff and Class Members from further harm.

159. As remedies for the substantive violations alleged above, and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's equitable authority, Plaintiff and Class Members seek a declaration that Quest has a continuing obligation to employ reasonable measures to safeguard the PII and PHI it retains and to provide any notice required by applicable law.

160. Plaintiff and Class Members also seek appropriate injunctive relief requiring Quest, with the precise terms of such relief to be determined after discovery, to:

a. implement and maintain reasonable administrative, technical, and physical safeguards appropriate to the nature and sensitivity of the PII and PHI it retains;

b. obtain an independent assessment of the security of the systems and networks in which PII is maintained and remediate material vulnerabilities identified through that assessment;

c. implement and maintain reasonable access controls, multifactor authentication, encryption, network segmentation, logging, and monitoring where appropriate;

d. maintain reasonable procedures for detecting, investigating, containing, and responding to suspected unauthorized access;

e. maintain and enforce reasonable policies governing the retention and secure disposal of PII;

f. securely delete PII and PHI that Quest no longer has a legitimate business or legal need to retain;

g. provide appropriate cybersecurity and privacy training to personnel with access to PII or PHI;

h. provide affected individuals with complete and legally compliant notice concerning the Data Breach;

i. provide appropriate identity-theft protection and credit-monitoring services to affected individuals, if warranted by the categories of PII and/or PHI involved; and

j. submit periodic reports or certifications demonstrating compliance with the relief ordered by the Court for a period the Court determines appropriate.

161. Plaintiff and Class Members seek such additional declaratory and prospective equitable relief as the Court determines necessary and appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed Nationwide Class and the New York Subclass, respectfully requests that the Court enter judgment in his favor and in favor of the Nationwide Class and the New York Subclass and grant the following relief:

A. Certifying this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the proposed Nationwide Class and the New York Subclass;

B. Appointing Plaintiff as representative of the Nationwide Class and the New York Subclass and appointing Plaintiff's counsel as Class Counsel;

C. Awarding Plaintiff and Class Members actual, compensatory, and consequential damages recoverable under the governing law, and nominal damages for an established breach of contract where available, without duplicate recovery;

D. Awarding Plaintiff and Class Members appropriate restitution and other equitable monetary relief, including restitution of benefits unjustly retained by Quest, to the extent permitted by law;

E. Declaring that Quest has a continuing obligation to employ reasonable measures to protect the PII and/or PHI it retains and to provide affected individuals with any notice required

by applicable law;

F. Entering appropriate injunctive relief requiring Quest, with the precise terms to be determined after discovery, to:

i. implement and maintain reasonable administrative, technical, and physical safeguards appropriate to the nature and sensitivity of the PII and/or PHI it retains;

ii. obtain an independent assessment of the security of the systems and networks in which PII and/or PHI is maintained and remediate material vulnerabilities identified through that assessment;

iii. implement and maintain reasonable access controls, multifactor authentication, encryption, network segmentation, logging, and monitoring where appropriate;

iv. maintain reasonable procedures for detecting, investigating, containing, and responding to suspected unauthorized access;

v. maintain and enforce reasonable policies governing the retention and secure disposal of PII and/or PHI;

vi. securely delete PII and/or PHI that Quest no longer has a legitimate business or legal need to retain;

vii. provide appropriate cybersecurity and privacy training to personnel with access to PII and/or PHI;

viii. provide affected individuals with complete and legally compliant notice concerning the Data Breach;

ix. provide appropriate identity-theft protection and credit-monitoring services to affected individuals, if warranted by the categories of PII and/or PHI involved; and

x. submit periodic reports or certifications demonstrating compliance with the relief ordered by the Court for a period the Court determines appropriate;

G. Awarding reasonable attorneys' fees, litigation expenses, and costs to the extent authorized by law;

H. Awarding pre-judgment and post-judgment interest at the maximum rates permitted by law; and

I. Granting such other and further legal or equitable relief as the Court determines just and proper.

**JURY DEMAND**

Plaintiff, individually and on behalf of the Classes, hereby demands a trial by jury for all issues triable by jury.

Dated: October 27, 2026

Respectfully submitted,

*/s/ Gary S. Graifman*

Gary S. Graifman
Melissa R. Emert*
**KANTROWITZ GOLDHAMER GRAIFMAN PERLMUTTER &**

**CARBALLO P.C.**
135 Chestnut Ridge Road-Suite 200
Montvale, NJ 07645
Tele: 845-356-2570
Fax: 845-356-4335
ggraifman@kgglaw.com
memert@kgglaw.com

Lynda Grant*
**THE GRANT LAW FIRM**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tele: 212-292-4441
Fax: 212-292-4442
*lgrant@grantfirm.com*

***Pro Hac Vice admission forthcoming***

***Counsel for Plaintiff and the Proposed Classes***